Please the court. This is Fatima Maru for the petitioner. This is a case where the BIA failed to consider all evidence relevant to the possibility of future torture, failed to explain its reasoning, misstated important facts, and misapplied the legal standard for protection under CAP. Regarding the failure to consider all evidence, the BIA's decision to debate included the testimony of only one of the two experts. While the government speculates that the BIA omitted Mr. Rodriguez's testimony and attempts to explain as to why, it has no substitution for the BIA's own explanation and consideration of the issues. Mr. Rodriguez's testimony is highly relevant to the likelihood of torture by other gang members due to racial rivalries because it explains why Mr. Cole would be targeted because he is black. It also provides context for understanding Mr. Canales' assessment that there's a 75% chance of torture by other gang members. Did the BIA order Mr. Cole to remove his tattoos? No, the BIA didn't. And the BIA misstated the facts in stating there's no indication, I quote, that he couldn't remove his tattoos. In fact, both experts testified about why he couldn't remove his tattoos. But the BIA didn't order him to remove his tattoos. No, the BIA didn't order him. What's the evidence in the record that Mr. Cole would be denied medical care in Honduras based on his gang tattoos? The main evidence based on his gang affiliation is the expert Canales' testimony of intentional denial of medical care. There's also evidence in the record that he would be – that there's intentional denial of medical care on account of race. And I would urge you to look at the WHO report on page 805, which says that black and indigenous populations suffer from marked inequality in access to service. The report of the U.N. special rapporteur. Was there any contrary evidence? There was absolutely no contrary evidence on any of the intentional denial of medical care testimony, Your Honor. So there are several reports. So the government would agree with you on that? Go back to the other issue. Okay. You said that, yes, the BIA didn't order him to remove his tattoos, but he seemed – they seemed to take that into account that he could have his tattoos removed as being relevant to his cat claim in some fashion. Right. So to the extent that the BIA was already exceeding its grounds, I would agree that that shouldn't be a relevant determination. But I also want to point out that the BIA actually misstated the facts and that there is evidence that removing tattoos, first of all, leaves visible scars. And so it's clear that someone has removed the tattoos and they remain a target. That's in both experts' testimony. But you don't have the tattoo. You showed you once had a tattoo. But if a gang thinks that you've removed a tattoo, they will still attack you because they think that you're trying to lead the gang. Because both experts testified, and it's in the evidence at page 720 and 726, I directly quote, trying to erase tattoos is to risk death. That's the news report on page 720. And Mr. Rodriguez testified on page 160 – I'm sorry, 158 to 159, that removal of tattoos is not commonly available in hunters and that it leaves scars. And Mr. Canales, as cited in our brief, also testified to that fact. And there was no contradictory evidence on this point. Now, in this case – Well, you know, you're trying to prove a case. You have to show it will be 51 percent likely that something bad will happen to them in the way of torture. And you don't have any quantification of how often you can tell a gang member after the tattoo has been removed. How long the scar remains? I believe the scar is permanent, Your Honor. No, but you don't have any quantification of how accurate a gang can determine that this man belonged to their gang or another gang. I have no idea. Well, that's where Mr. Rodriguez's testimony on race comes in. Because Mr. Cole is black, he's a minority. He stands out easily in Honduras. And he testified that Latino gangs see blacks as their enemies. So even if they can't get close enough to see the specific tattoos on his face, he will be identified as a target. That was the purpose of Mr. Rodriguez's testimony. And this case, unlike the others, did have some quantification testimony. Yes, it did, Your Honor. Which was what? Which was that the chance of being targeted by rival gangs was 75 percent, and the chance of being detained by the police was 90 percent, and that if detained, he will be beat up. And to address the question that came up in a couple of previous cases about the standard of harm, I want to point out here that because Mr. Cole has suffered severe injuries to his head and his internal organs, the level of harm that would be required to constitute torture of him is less than in the case of a healthy adult male. And I would analogize to Hernandez-Ortiz, where the court has considered persecution of children and said because of their particular characteristics, a lower level of harm would amount to torture. So in assessing the evidence of whether beatings would amount to torture, I argue it's particularly persuasive here because of his vulnerable physical and limited cognitive abilities. Where's Mr. Cole now? He's been released from detention under COSAS, and he is here in the Los Angeles area. Now, he has past convictions? Yes, Your Honor. They disqualify him from asylum. He does not qualify for asylum. He does not, Your Honor. I want to also address the legal standard in this case because this is an issue that wasn't fully briefed because I didn't fully grasp it until I was preparing for oral argument. But the analysis that the Board did here was it looked at each way that Mr. Cole could be tortured. It said it looked at the risk of torture by the police, by rival gangs, and by vigilante groups. And it said in each of those cases, the risk was less than 50 percent. That's the wrong analysis. As in persecution ---- It hasn't been briefed. It wasn't briefed in any of those cases. And I'm happy to submit a supplemental brief on that issue. I actually confer with a mathematics professor who did a statistical analysis for me and said that even a 20 percent chance of each type would lead to an overall chance of torture of 50 percent. And there's also the race issue, too. And there's the race issue. But just on this point of applying the wrong standard, I mean, this comes up frequently in CAF claims, and I think we just assume that 50 percent means 50 percent with each argument. But actually, it's the cumulative risk that we're looking at. And so the chance of each type of harm can be less than 50 percent if the overall risk of torture is still equal or exceed 50 percent. Can you address the relevance of Archie Aka to your argument? Of which case, Your Honor? Archie Aka. Well, I don't believe that that case directly impacts ours, Your Honor. In which sense were you ---- Well, it partly seemed to have an overall ---- With regard to the asylum issue, at least, it suggested there were policy reasons not to recognize asylum claims from people of this variety. So one question is, does that carry over to CAT? And the second question is, what did it also rule against the CAT claim that that seemed to be more on the facts? Well, asylum is ultimately a discretionary determination, so I could see how policy might come into play there. But CAT is not discretionary, Your Honor. And so if you meet that showing of 50 percent chance, there shouldn't be any waiver from that based on policy issues. Regarding Mr. Canales' testimony, which the court found unpersuasive ---- I'm sorry, the BIA found unpersuasive, I want to note that the two reasons given just don't hold up. The first reason was that his testimony wasn't supported by specific examples. That's simply not true. We cited in our briefer, he gave many specific examples. The second reason was the State Department report, which the Board only vaguely referenced, and that overwhelmingly supports Mr. Cole's arguments of extrajudicial killings and beatings of suspected gang members. I would point out at page 502, the State Department notes that ---- So I guess what I'm hearing you say, then, we wouldn't be relaying the evidence because all of the evidence ---- there was only evidence that supported your client's position. There was no contrary ---- There's no evidence actually contradicting him. The only evidence ---- No contrary evidence on any of the points. There's no contrary evidence saying that the police don't beat suspected gang members or don't kill them. There is evidence that the Federal ---- Well, let's stop on this killing because, as I said to other counsel, torture is different from killing. Mr. Canales says there's a 75 percent chance of being killed. That's not a 75 percent chance of being tortured. Well, the worst types of torture results in death, Your Honor, so I would disagree. I would say ---- It's also what ---- The worst types of torture result in death, so I would agree with the prior counsel. No, no. It's not. When the States of the United States execute people, they're not torturing them. If it's ---- I mean, for example, it's a hard question because it seems that some deaths involve torture. But in death penalty cases, for example, there's murder and then there's murder with torture. They're not necessarily the same. So it may not be that all deaths are torture, but I think it would be reasonable to assume that ---- Well, you like to say that, but you can't say it. Well, I can point you to page 502, Your Honor, where the State Department notes that security officials had arbitrarily arrested and sometimes tortured more than 34,000 people based on forms of dress and types of tattoos. Is that ---- So they specifically mention torture. Does sometimes give you a 51 percent chance? No, Your Honor. That's why we have to look at the evidence cumulatively. There's no one place that's going to say there's a 51 percent chance. But also, with regard to whether there's contrary evidence in the record, I understand your argument to be, at least in part, that without saying that there is a 51 percent chance, that we ---- that the BIA got a lot of the evidence wrong and therefore should do it again. Exactly, Your Honor. Not that we should be weighing it, but that it should weigh it right. Right. Both the IJ and the BIA applied the wrong standards. So to the extent that ---- But also got some of the facts wrong. Exactly, Your Honor. Yes. With regard to whether Canales did have particularized statements and ---- Yes. And with regard to the medical care and with regard to the intentional or the ability to remove tattoos, Your Honor. And so it's not that we are going to weigh anything. It's that we're going to tell them to weigh it on the right facts. This case should be remanded. If we were to remand. Yes, Your Honor. Exactly. I'm out of time now. Okay. You're out of time. We'll give you a minute in rebuttal. Thank you. Thank you. May it please the Court. Good morning, Your Honors. Edith Yacon on behalf of the Respondent, the Attorney General of the United States. This Court should deny the petition for review as substantial evidence supports the agency determination ---- Well, you just heard the argument that I just heard, and counsel for petitioner said that there's no evidence. To begin with, the burden of proof in a convention against torture claim is on the petitioner. Petitioner must demonstrate that it's more likely than not that he or she will be tortured by the government. This record is really different from the others in the sense that there was quantification and that there were a lot of very extreme things that seemed to have happened in the past with regard to people of this general ilk like burning up prisons and, you know, by the government. There's certainly uncontradicted evidence of that kind, which doesn't exist in the El Salvador cases. So why isn't it at least true that there was just ---- that given what was uncontested and given the mistakes, some mistakes that were made as to facts in the record, that at least the BIA should take another look at it? To begin with, I would challenge the assertion that the Board made any mistakes in stating that the expert didn't note any specific examples. What the immigration judge stated on page 99 of the record, page 13 of her decision, was that the witness gave percentages of the likelihood of torture but did not present evidence of others who have been similarly situated to the petitioner being incarcerated, tortured. Well, that seems to be an argument that he's sort of hinting at and that your brief makes more specific, that the difference is that he's a crip and not one of these other guys. Is that what you're saying? Or that he's black? That is relevant. Mr. Canales stated that a majority of the individuals that he works with are under the age of 25. Only 10 to 15 percent of them are of Afro-Honduran background and descent, and none of them were former crips. In other words, the immigration judge may have taken this into account. Is there any reason in the world to think that crips were going to be better off and tattooed crips who go to El Salvador are better off for some reason? The point is, is that the burden was on Petitioner to demonstrate that his evidence demonstrates eligibility for protection under the Convention on the Use of Torture. The expert didn't seem to think there was any difference. The expert seemed to indicate that he was quite certain, but the immigration judge gave his evidence and testimony limited weight. Your Honors, as you know, expert opinion testimony, while undoubtedly a form of evidence, doesn't purport to be evidence as to fact, but instead is only admissible if it helps the trier effect to understand the evidence or determine a fact at issue. And in this case, the immigration judge listened to the expert testimony and then reviewed the State Department country reports and considered evidence such as the fact that torture is against the law in Honduras, that the government of Honduras is attempting to punish and to punish the government of Honduras. The State Department reported that they opened an office of a new office to But what about all this evidence which isn't contradicting, and as I understand it, is in the State Department report of these really grisly, disturbing incidents that cover hundreds of people, lots of people at a time, who are being burned in prison? The evidence also indicates, for example, that just in 2008 alone, 268 police officers were The Porvenir jail massacre, which did involve gang members, in which 60-plus gang members died in a Honduran prison, was prosecuted by the Honduran government, and 21 individuals, members of the government, were charged and sentenced for that jail massacre. In other words, the evidence indicates that although there are abuses of authority by Honduran police officers and other authorities, the Honduran government is attempting That would be useful if these were not government officials, but they were government officials anyway. So the fact that they're after the fact prosecuted doesn't accomplish a whole lot. In other words, it's not an acquiescence problem at that point because they were the government. Well, Your Honor, Petitioner also contends that in prison and in the Honduran medical system, he would not receive sufficient attention and or would be tortured within the prisons. And if within the control of the government, Petitioner's burden is to demonstrate that the government has a specific intent, excuse me, to torture the Petitioner. So in other words, there's a distinction between specific intent and general intent. And the case law of this Court clearly indicates that within the authority or when under the control of the government, Petitioner must demonstrate that the government specifically intended to torture the Petitioner. So it's not enough that the government is placing individuals in prisons that are substandard in terms of conditions or don't sufficiently protect gang members from other gang members and violence that might occur. In other words, the government must be specifically intending the consequences, the torture which occurs, as opposed to the circumstances which end up leading to violence or death in certain circumstances such as the Portlander Jail massacre which was later prosecuted. But that was the government. I mean, why are you saying the government didn't intend it? Whoever burned up that prison intended it. And they were the government. Petitioner's burden would be to show that there's a specific intent to torture. And in that case And, I mean, frankly, I mean, this sounds, it's the only set of facts in this case that, you know, sounds like Nazi Germany or Nazi Eastern Europe where they used to put Jews in churches and burn them up. That's not torture? Well, Your Honor, it's important to note also that the IJ and the Board explained that Petitioner strung together a set of suppositions, not each of which was more likely than not to occur. And Petitioner presents a new mathematical argument here in court today. And the IJ and the Board are the same. But that wasn't briefed. That wasn't presented to the agency. And it wasn't presented to the agency. But it's self-evident, is it not, that in figuring out whether somebody is going to go to jail, I didn't need a mathematician to tell me that. I figured it out myself. That if you say there's a 20 percent chance that he's going to get tortured by these people and a 20 percent chance that he's going to get tortured by those people and a 20 percent chance that he's going to get tortured by those people, you don't divide them up. You add them up. Well, that's not what the agency is saying. What the agency is saying is that if you base your claim on the first supposition that police would become aware of you, the second supposition that they would then be paid. No, I understand that. But that wasn't her argument. Her argument was this other one, that you can't look at each different category discreetly. It's that you need to add them up. I understand. And the first argument I would make — You agree with that? Well, Your Honor, Petitioner didn't raise that challenge to the agency or before this Court interview. Well, is the agency required to accept each of those numbers as true? No. And the agency did not accept each of those numbers as true in this case. And, in fact, the agency explained, as in its present decision matter of JFF, that it's not enough to string together these suppositions. The Petitioner has to demonstrate that each step is more likely than not. And in this case, he presented sparse, if any, evidence as to how he would come to the attention of the authorities or even the other gang members. So his experts stated, for example, that — He didn't indicate how — How he's going to come to the — to the intention is that he's going to be removed and he's going to arrive in Honduras on an airplane with a bunch of tattoos. I mean, I don't — it doesn't take a whole lot of figuring out. A bunch of gang tattoos on him. Your Honor, it's less than obvious that upon arrival in a country with a set of tattoos, an individual would be prosecuted under an unknown law by authorities. No, no. But I'm saying — you're saying how would they know that he had a bunch of gang tattoos? They would look at him. Perhaps if authorities were face-to-face with him, they could see his tattoo on his face. But the question is, how would he even come in contact with authorities? How would he come in contact with rival gang members or death squads? And it's not obvious. This is something the Petitioner bears the burden of demonstrating. He can't just say, well, if I come into contact with authorities or if I come in contact with gang members, then this will happen, then that will happen. You have to demonstrate that each step in the chain of events is more likely than not to occur. And the Board and the immigration judge both agreed that Petitioner failed to do so. And it was his burden to do so. And for that reason, amongst others, substantial evidence supports the agency's determination in this case that Mr. Cole failed to demonstrate that it's more likely than not. Remember, this is a heavy burden to show. Petitioner must demonstrate not that there's some chance of torture, not that torture occurs in Honduras, but it's more likely than not that he will suffer torture by the Honduran government or with the consent or acquiescence including local blindness of the government. And he simply failed to do so. Your Honors, I would also note that Petitioner presented an additional new claim today in court relating to the medical condition of Mr. Cole and how a decreased level of harm would be required in order to torture Petitioner. That simply wasn't raised before the agency, and it's improper to do so here today. And in sum, Your Honors, I am sensitive to the fact that I'm almost out of time, so I would just ask that this Court deny the petition for review because the record does not compel the conclusion that Mr. Cole has demonstrated eligibility for deferral under CAT. As Judge Callahan has stated time and again this morning, this Court is not to reweigh the evidence under the substantial evidence test. And in this case, substantial evidence does support the agency's decision. Thank you very much for your time. Thank you very much for your argument. Thank you. And I'm going to give you one minute. Thank you. Your Honors, regarding the argument that these arguments were not previously raised, this is an issue that the Court can decide on its own. The Court can simply look at the Board's decision and decide that it's applied the wrong legal standard. And that was something the Board did. I already briefed at the Board how the IJ applied the wrong legal standard by requiring Mr. Cole to show that a majority of deported gang members were tortured. And I explained that that's the wrong legal standard because the point is it's an individual determination, and he has to show that he personally faces a greater than 50 percent chance. Now we have the BIA making a similarly erroneous application of the CAT standard. I also wanted to bring to the Court's attention the case of Jian Chen v. Ashcroft, 289F3D1113, 9th Circuit decision 2002. The State Department report dealing with the prosecution of a handful of snakeheads failed to rebut the expert's testimony that the snakeheads would torture the Petitioners with the acquiescence of the Chinese government. So the fact that a State Department mentions certain individuals are being tortured doesn't – cannot possibly go against the overwhelming evidence that this is actually unlawful. I just wondered how he was going to come to the attention of the government. I mean, there's something in the 2004 State Department report that says 34,000 people were arrested arbitrarily and sometimes tortured based on dress, tattoos, and so on. So is your basic argument that that's an awful lot of people and he's one of them and that's good enough? Yeah. There's other articles as well, Your Honor. On page 785, the Washington Times article says the police have made it a, quote, regular practice to descend on gang-ridden neighborhoods, round up suspected gang leaders, and haul them off to jail. And there's other similar descriptions of this being a common or regular practice, which shows cumulatively with the other evidence that there is a substantial likelihood that he will be identified during these searches. Okay. Thank you very much. Thank you both for your useful arguments in Cole v. Holder and the last case of Long Day, Ayala v. Holder. Thank you.
judges: Noonan, Berzon, Callahan